[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The three above-captioned actions were ordered by the court (Schimelman, J.) to be consolidated for trial on the basis that a common question of law and fact arises in each case. These cases were tried together before the undersigned. All the parties, both CT Page 2301 plaintiff and defendants, are Connecticut corporations. Broadly stated, each action is one upon a surety bond substituted for a mechanic's lien filed on property in Newington and each seeks money damages, interest pursuant to General Statutes 37-1st seq., attorney's fees and such other relief as deemed proper. In docket #281572 the plaintiffs are American On-Time Plumbing Heating ("American") and American Mechanical Contractors, Inc.[1] In docket #281573 the plaintiff is Bender Plumbing Supplies of New Haven, Inc. ("Bender"). In docket #280230 the plaintiff is Middlesex Supply Company ("Middlesex"). The defendants in each case are Foxboro Development Corporation ("Foxboro") and Aetna Casualty Surety Company ("Aetna").
At this point it will be useful to set out the pleadings in each of these cases. The complaints in each case are similar but not identical. Each complaint contains three counts. In each case it is admitted that the dispute arises out of the development of a condominium project commonly known as The Chase at Foxboro ("Foxboro") situated in Newington and more particularly described in the condominium declaration recorded at Volume 627, Page 45 of the Newington Land Records and that each plaintiff[2] filed a mechanic's lien on the Foxboro project property which liens are recorded in the Newington Land Records. It is also admitted in each case that on or about March 19, 1988 Foxboro filed an application for dissolution of mechanic's liens upon substitution of a bond under docket #CV-88-0342790 returnable to the Superior Court for the Judicial District of Hartford/New Britain at Hartford and that in those cases Foxboro obtained a court order to substitute a bond in lieu of the mechanic's lien in each case.
There are three counts in each of these three cases. In addition to the allegations already noted as admitted in the action brought by American, the defendants also admit America's allegation that "on or about November 1986, American entered into several agreements with the general contractor to supply and install certain plumbing materials to the site." The allegation that American-On-Time Plumbing and Heating Co. and American Mechanical Contractors are Connecticut companies "in the business of supplying and installing plumbing materials" is denied in each case. It is denied that American performed its obligations under the "aforementioned agreements", that a balance of $18,643.60 remains due American for materials furnished and services rendered in the Foxboro project despite demand for payment and it is also denied that the alleged nonpayment has caused "damage" to American. These admissions and denials are the essential allegations of the first count of American's complaint which count is directed only against Foxboro.
The second count of America's complaint which sounds in unjust enrichment (as well as quantum meruit according to CT Page 2302 American) is directed only against Foxboro, incorporates all the allegations of the first count with the same answers by the defendant as in the first case but it adds two additional allegations. These two allegations are essentially denied by the defendant. They assert that the amount of $18,643.60 plus interest is justly due and owing to [American] pursuant to the "aforementioned agreements" and that Foxboro is liable "as both a principal and agent of the property owners" on the bond, admittedly furnished with Foxboro as principal and Aetna as security in the amount of $20,000 in lieu of and in substitution of the mechanic's line.
The third count which is directed only to Aetna incorporates all the allegations of the first count (with the same responses by the defendant as in the first count) and it makes two further allegations. One alleges the execution by Aetna as surety with Foxboro as principal of a $20,000 bond which was substituted in lieu of the mechanic's lien. The other allegation is that Foxboro "has neglected, failed and otherwise refused to pay the amount of [American's] claim, $18,643.60 plus interest, and [American] now brings this action upon [the] bond against Aetna . . . in accordance with the provisions of Connecticut General Statutes Section 49-37." The defendants admit these two additional allegations, "but [deny] any and all liability to the Plaintiffs." The defendant Foxboro also claims by way of setoff "all costs incurred in the completing of Building 30 of the Foxboro project."
Bender's complaint is also in three courts. The first count which is directed only against Foxboro contains allegations which are substantially the same as those made in the first count of American's complaint with the same responses by the defendants with, however, the following differences. Foxboro alleges that Bender is in the business of supplying plumbing materials, "that on or about November, 1986, [Foxboro] entered into an agreement with the plumbing subcontractors in furtherance of a subcontract between the plumbing subcontractor and the general contractor to supply certain plumbing materials to the [Foxboro] project, and that "pursuant to the aforementioned agreement, Bender performed its obligations by furnishing certain plumbing materials to the project." The allegations are essentially denied. It is further denied that despite demand for payment, there is a balance of $7,408.87 due Bender "for materials furnished to the Project." While it is admitted that Bender filed and recorded a mechanic's lien on the Foxboro project on February 29, 1988, it is denied that that was done "in accordance with the provisions of Connecticut General Statutes Section 49-33 et seq.[3] Bender's second count which sounds in unjust enrichment (as well as quantum meruit according to Bender) and is directed only against Foxboro, incorporates all the allegations of the first count but it adds two further allegations that are essentially denied. The first is CT Page 2303 that "the amount of $7,408.87 plus interest is justly due and owing to Bender pursuant to the aforementioned agreement." While admitting that portion of the second allegation which asserts the substitution of an $8,400 bond for a mechanic's lien with Foxboro as principal and Aetna as surety, Foxboro denies the balance which alleges that it is liable on that bond "as both a principal and agent of the property owners."
The third count which is directed only to Aetna incorporates all the allegations of the first count and makes two further allegations. An allegation that Aetna as surety executed an $8,400 bond with Foxboro as principal in substitution of the mechanic's lien is admitted. As in the American case the allegations that the "principal, Foxboro. . ., has neglected, failed and otherwise refused to pay the amount of Bender's claim of $7,408.87 plus interest and [that] Bender . . . brings this action against. . . . Aetna . . . in accordance with the provisions of Connecticut General Statutes Section 49-37" is admitted; in its answer to this allegation Aetna also states, ". . . but [the defendant Aetna denies] any and all liability to the Plaintiff."
Middlesex's complaint is also in three counts. The first count which is directed only against Foxboro contains allegations which are substantially the same as those in the first counts of the Bender cases and with the same responses by the defendants.[4]
The second count which sounds in unjust enrichment (as well as quantum meruit according to Middlesex) is directed only against Foxboro. In addition to incorporating the first ten paragraphs of the first count as did the corresponding counts of the Bender complaint, the second court also has two additional allegations similar to the two added in the Bender complaint with the same responses by the defendant. The third count is directed against only Aetna and contain similar allegations to that count in the Bender complaint which elicited the same responses as in Bender.
After all parties rested at the end of the trial the defendant Foxboro made its motion to dismiss the second count in each of the three cases. The court did not rule on that motion at the time, but does so below in this opinion.
At this point the court notes that these cases were vigorously tried by counsel. Several witnesses testified and a number of exhibits were admitted into evidence. The evidence was conflicting and produced serious issues of credibility. The trier of fact determines the credibility of witnesses and the weight to be accorded their testimony and where the evidence is conflicting, its probative force is for the trier of fact to decide. Robert Lawrence Associates, Inc. v. DelVecchio, 178 Conn. 1, 14,420 A.2d 1142 (1979): McNamee v. Woodbury Congregation of Jehovah's Witnesses, 194 Conn. 645, 648, 484 A.2d 940 (1984): Steinman v. CT Page 2304 Maier, 179 Conn. 574, 576, 427 A.2d 838 (1988). It may also draw reasonable inferences from the evidence. In re Juvenile Appeal (82-AB), 188 Conn. 557, 561, 452 A.2d 113 (1982). The trier may believe all or part of the testimony of a witness. State v. Rothenberg, 195 Conn. 253, 257, 487 A.2d 545 (1985); Gutowski v. New Britain, 165 Conn. 50, 56, 327 A.2d 552 (1979); Rood v. Russo,161 Conn. 1, 3, 285 A.2d 220 (1971). Moreover, the court is not bound by the uncontradicted testimony of any witness, Bieluch v. Bieluch, 199 Conn. 550, 555, 509 A.2d 8 (1986); Acheson v. White,195 Conn. 211, 217, 487 A.2d 197 (1985) and, in this connection, "The trial court must assess the credibility of the testifying witness and consider the presence or absence of corroborating evidence." Bieluch v. Bieluch, supra 555-556. "Testimony that goes uncontradicted does not thereby become admitted and undisputed; . . . nor does the strength of a witness' belief raise it to that level." Stanton v. Jingley, 177 Conn. 558, 563, A.2d (1979).
The following which this court finds as facts will serve to set out the background of these cases and will be supplemented by other facts found set out later in this opinion as the issues require. All the parties to these actions are Connecticut corporations. Frank DeCato ("DeCato") is the present of American-On-Time Plumbing Heating and has been in the plumbing business about twenty years. Steven Krohn ("Krohn") is the vice president of Foxboro and he oversees construction of projects from their start through sale. He has built over 1000 condominium units. DeCato, on behalf of American, negotiated with Krohn the five executed contracts[5] American had with Foxboro concerning the buildings on the Foxboro project in which American was to work. DeCato actually prepared the five contracts. The Foxboro project which consists of condominiums, has thirteen buildings which contain, in total, ninety two units. Among other things Krohn regularly inspects the progress of construction on the project, passes on requisitions for payment of bills on the project, assesses problems that arise, and deals personally with subcontractors, including American. Tom Gurtel is Krohn's salaried construction supervisor for Foxboro, he he speaks with Krohn on a daily basis and is on the project site at least five days a week. Gurtel is still in Foxboro's employ.
Robert Miller has been the president of Middlesex for eighteen years and has spent most of his life in the plumbing supply business. He is quite familiar with pricing and values in the plumbing supply business. Marge Peplau is the corporate secretary and office manager of Middlesex and has worked at that firm for almost twelve years. She is quite familiar with their accounts, purchasing and billing procedures. Norman Bender is the owner of Bender Plumbing Supplies of New Haven, Inc. ("Bender") and has been associated with that firm for many years. He is CT Page 2305 quite familiar with its accounts, billing practices and the prices and values of plumbing supplies. Jeffrey Copobianco ("Copobianco") has been the vice-president of R. T. Copobianco, a plumbing, heating and oil burner contractor in Hartford, for about ten years. He has done work on the Foxboro project both before and after American worked on that job.
American worked at Foxboro for approximately one year, beginning in November or December 1986. It ceased working there at about the end of November or very early in December 1987. American left the project at that time because, it claims, it was not being paid by Foxboro as had been agreed. American maintains that any "complaint" Foxboro may have had really did not go to the quality of its work. The dispute between American and Foxboro centers on Foxboro's refusal to pay American's invoice to it of October 22, 1987, which totals $18,643.60 for work American alleges it performed at Foxboro.[6] When American did leave this project it had not completed the work on Buildings #30 and #32 that it had agreed to do under its contracts with Foxboro. It was upon Foxboro's refusal and after demand, some discussion to pay this amount that American left. (3, 6B). By a memorandum, dated November 30, 1987, Foxboro informed American of the "Plumbing Completion Schedule" for Buildings #30 and #32. This set a completion date of December 4, 1987 for plumbing in Building #30 and one of December 23, 1987 for plumbing in Building #32. (Ex. B). American, however, did not return to the project to complete the work on Buildings #30 and #32.
In these cases the plaintiffs made the following claims: (1) American, Bender and Middlesex filed valid mechanic's liens as defined in General Statutes 49-33.[7] American maintains that its lien is proper and is not affected by the liens filed by the "suppliers" Bender and Middlesex. It goes on to claim that the mechanic's liens of Bender and Middlesex are valid and supported by the evidence. It is claimed that certain written waivers of mechanic's liens in evidence as exhibit 5[8] signed as to certain of the buildings at Foxboro "do not automatically vitiate the rights to claim a lien." All the plaintiffs contend that each should recover under "the theories of unjust enrichment and quantum meruit." Each of them also claims that Foxboro's motion to dismiss the unjust enrichment (quantum meruit) claims lack merit and should be denied.[9]
The defendants Foxboro and Aetna make the following claims: Neither Foxboro and/or Aetna are liable to American for any balance allegedly due on its bond claim. Foxboro is not liable to American or Bender or Middlesex for any balance claimed to be due for any of their respective claims for unjust enrichment; American or Bender or Middlesex is not entitled to its claim for attorney's fees and certain waivers of mechanic's liens signed by American as CT Page 2306 to three buildings it worked on at Foxboro operates as a full waiver as to all the property described in those waivers. The defendants contend that American's lien claim should be reduced to zero because of reductions and credits due the defendants arising from payments uncredited by waived claims, by setoff (against American) for unfinished work, by backcharges against American for incomplete work, defective work and warranty claims and by Foxboro's appropriate disallowance of improper claims by American for certain extras. Further because the defendants maintain that the lien claims of Bender and Middlesex are "derivative" from its claim of American, it is asserted their lien claims are subject to all the reductions and diminutions that may be found as to American's lien. Insofar as the lien claims are concerned, the defendants argue that there may be only a single recovery for all the plaintiffs, the maximum sum of which may be only so much of American's claim as the court finds valid.
The defendants also claim, in the alternative, that even if any or all of the plaintiffs' mechanic's liens were properly filed, then none of them may recover against the defendants because American abandoned their work at Foxboro and consequently breached the contract. Therefore, they maintain not only is American barred but that Middlesex and Bender, who stand or fall with American, are also barred. Parenthetically we note that the question whether there was an abandonment by American and consequently a breach of contract by it, is ordinarily a question of fact. Rowe v. Cormier, 189 Conn. 371, 373, A.2d (1983); M. Shapiro Son Construction Co. v. Battaglia, 138 Conn. 238, 244, 456 A.2d 277 (1951). The action, however, constituting an abandonment must be absolute and unequivocal. M. Shapiro Son Construction Co. v. Battaglia, supra. Abandonment, like entry into a contractual relation, depends upon the intent of the parties and the relevant intent is to be inferred "from the attendant circumstances and conduct of the parties. Yale Cooperative Corporation v. Rogin, 133 Conn. 563, 568, 53 A.2d 383
(1947). . ." Rowe Cormier, supra, 372-373.
Certain general principles concerning mechanic's liens are appropriately set out at this point. The mechanic's lien is a creature of statute. Computaro v. Stuart Hardwood Corporation,180 Conn. 545, 550, 429 A.2d 796 (1980); Gruss v. Miskinis,130 Conn. 367, 370, 34 A.2d 600 (1943). "The purpose of the mechanic's lien is to give one who furnishes materials or services `the security of the building and land for payment of his claim by making such a claim a lien thereon . . .' (citations omitted)' H S Torrington Associates v. Lutz Engineering Co., 185 Conn. 549, 553,441 A.2d 171 (1981). Because the mechanic's lien is a creature of statute, a lienor must comply with statutory requirements in order to perfect his claim. H S Torrington Associates v. Lutz Engineering Co., supra; Swift Upson Lumber Co. v. W. L. Hatch CT Page 2307 Co., 115 Conn. 494, 498, 162 A. 19 (1932). Provisions of this law should, however, be liberally construed so as to reasonably and fairly carry out its immediate intent. Henry F. Raab Connecticut v. J.W. Fisher Co., 183 Conn. 108, 115, 438 A.2d 834 (1981); Roundhouse Construction Corporation v. Telesco Mason Supplies Co.,168 Conn. 371, 385, 362 A.2d 778, vacated 423 U.S. 809,96 S.Ct. 20, 46 L.Ed.2d 29 (1975), on remand 170 Conn. 155, 368 A.2d 393, cert. denied 429 U.S. 889, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976). While our Supreme Court has stated that this "remedial purpose . . . requires a generous construction. . . ." it has also said that "generosity of spirit does not, however, permit departure from reasonable compliance with the specific provisions of the statute. . . ." Camputaro v. Standard Hardwood Corporation, supra 550, 551. "A subcontractor's right to claim a lien against a property owner with whom he is not in privity was `created because the subcontractor has furnished material or labor to or for the contractor which has gone into the owner's building.' J. L. Purcell Inc. v. Libbey, 111 Conn. 132, 137, 149 A. 225 (1930)." H. S. Torrington Associates, supra. Where a bond is given in lieu of a mechanic's lien, the plaintiffs' rights on the bond can rise no higher than those acquired under the underlying mechanic's lien for which the bond is merely a substitute. General Statutes 49-37; Biller v. Harris, 147 Conn. 351, 353, 161 A.2d 187 (1960); Hartlien v. Code, 144 Conn. 499, 505, 134 A.2d 245 (1957). Camputaro v. Stuart Hardwood Corporation, 180 Conn. 545, 549,429 A.2d 796 (1980).
We turn first to the claim of American against Foxboro under the first count involving its mechanic's lien. In its brief American maintains that "it is not disputed that it furnished materials and rendered services in the construction of the building[s] or that American did so by virtue of the land on which the building was being erected or that American has not been fully paid." Rather, it maintains that the only issue is the "validity of the backcharges, cost to complete and cost of correction work." It is fair to say that the credible evidence disclosed that it did furnish certain materials and rendered services in the construction of buildings on the land at Foxboro. Foxboro maintains that it owes American no money at all.[10] American also contends that the only issue is the validity of the backcharges (made by Foxboro against American), Foxboro's cost to complete the buildings American had agreed to work on and the cost of correction work to Foxboro for American's prior work. This, however, is tied to the lien balance of $18,648.50[11] which American claims against Foxboro and which details American's claims. These claims of Foxboro and American were hotly contested at the trial and credibility became crucial particularly as to the evidence adduced through Frank DeCato of American and Steven Krohn of Foxboro. CT Page 2308
The better place to start is with American's claim of $18,643.50. American's position is that this amount[12] is its dollar claim against the defendant both by lien and its unjust enrichment claim. This sum includes charges for extras, materials, material installation, hook-ups, repiping of water and plastic in certain bathrooms due to "framing error", moving of gas lines and the moving of certain copper risers and a stack." All of this claim of $18,643.50, except a minor portion, was disputed at the trial. The reasons advanced for these charges by American included that some were not covered by the written contracts,[13]
errors of other workmen on the project and that some were due to requests made by American by Foxboro's superintendent on the project. Foxboro's reasons for resisting payment of the amount claimed included that certain items of the claim were covered by the written contracts, certain items had already been paid by Foxboro and the errors attributed to other workmen were really attributable to American itself.
The evidence adduced on this phase included the history of the business relationship between Foxboro and American on the Newington project.[14] Under its written contracts American was to bill Foxboro by the 25th day of each month which billing was also to include projections to the last working day of that month of moneys due American for that projection period. In turn, Foxboro was to pay American no later than the 10th day of the following month. There was no serious question about the promptness of Foxboro's earlier payments totalling $223,878.60[15] over the relationship except as to the matters constituting the $18,643.50 that American claims. There were, however, serious questions about certain monthly requisitions submitted by American over their relationship on this project. In that regard it must be pointed out that the moneys claimed to be due American for these monthly periods include certain projections, which as American argued, are estimates at best. American offered this explanation as to certain backcharges[16] made against them by Foxboro. Foxboro, nevertheless, maintains that American indulged in a "conscious and continued pattern of overbilling, mischarging for extras or billing for items never delivered." The evidence demonstrated that there were instances where American's requisitions were appropriately backcharged or debited. For example, its total billing on its requisition of July 24, 1987 was for $29,940.00. Upon examination of that requisition, Foxboro made a backcharge on it for $10,405.60. DeCato admitted he accepted this backcharge because it was for "stuff" American did not install; Foxboro, however, argued that it was for materials American did not supply. On its June 23, 1987 requisition, American's total billing was $29,100.00. Upon examination, Foxboro made a backcharge of $5,373.60 for materials billed therein but not supplied. DeCato admitted at trial that this was a valid backcharge and that it involved fixture "we" had not CT Page 2309 supplied but "we missed it." On its April 24, 1987 requisition, American's total billing was $21,000.00. In payment American was given a check dated May 11, 1987, in the amount of $22,791.36. Foxboro was never given credit by American for the overpayment of $1,791.36, but at the trial DeCato conceded that this overpayment should be applied as a credit against American's present claim.[17]
American maintains that it has proven its entitlement to recover the full amount of its claim, i.e. $18,643.60.[18]
American claims extras totaling $4,160.00 for repiping water and plastic in certain bathrooms in Buildings #23, 27 and 29, all "due to framing error" by other subcontractors. The evidence on this aspect was conflicting. There was no credible evidence of any "framing error" in these cases that would impact on American's work; this requires that this $4,160.00 claim be rejected.
American also claims extras in the amount of $1,840.00 for "46-gas stove hookukps @ $40.00 each" and a dryer hookup at $90.00 for a total of $1,880.00. The evidence here was also conflicting. DeCato testified that the gas hookups of the gas stoves and the dryer were not covered by the contracts while Krohn testified that it was. All of American's requisitions, some eleven in number, submitted for payment over the period American worked at Foxboro from November 1986 to December 1987, were in evidence as full exhibits. They were detailed, and none of them, as DeCato conceded at trial, make any charge for a gas stove hookup or dryer hookup. Krohn also testified that, in his experience of building over one thousand condominium units, he has never been charged separately for gas stove hookups. Moreover, DeCato drafted all the contracts and any ambiguity is to be resolved against the drafter. See Hartford Electric Applications of Thermolux, Inc. v. Alden, 169 Conn. 177, 182, 363 A.2d 165 (1975). The credible evidence and the law requires that this claimed extra of $1,880.00 be rejected.
Next American claims that Foxboro is not entitled to credit the amount of $1,791.36 against American's claim. It argues here that the evidence of DeCato demonstrates that this amount was credited to Foxboro and demonstrates that Foxboro "received credit for the entire payment of $22,791.36 made on May 12, 1987." American claims that Foxboro is confused in claiming entitlement to this credit and that its confusion lies "in the application of that payment: contract work versus extra work." It contends that its requisition of April 24, 1987 "confirms payment" in the amount of $21,000.00 and that the second requisition of that date "confirms payment" in the amount of $1,791.36 and that, thus, the total payment credited Foxboro is $22,791.36. American further contends that DeCato "clarified this distinction on cross-examination." Here too this claim cannot be sustained in the credible evidence. CT Page 2310 It is true that American's typewritten requisition of April 24, 1987 for $21,000.00 has the following handwritten notation "Pd. 5-12-87 $21,000.00" and its second typewritten requisition of that date for $1,791.36 has the following handwritten notation "Pd. 5-12-87 $1791.36." Quite apart from the fact that there is no evidence as to who made either of these notations these two figures total $22,791.36. This is the specific amount made payable, on behalf of Foxboro to American, by its cancelled check of May 11, 1987 to American. On cross-examination DeCato, with all the cancelled checks before him including that of May 11, 1987 admitted[19] that American had not given credit to Foxboro for that amount. This court has great difficulty squaring DeCato's express admission that a credit of $1,791.36 was due Foxboro with the claimed later "clarification" and, therefore, the court concludes on the credible evidence that Foxboro has failed to demonstrate why the $1,791.36 should not be deducted from American's claim.
Going on, there is also included in American's claim certain charges which Foxboro argues are waived because of certain mechanic's lien waivers signed by American concerning them. American's claim includes inter alia extras for Buildings #21, 23 and 24 at the Foxboro project. There are in evidence three waivers of mechanic's liens, one for each of three buildings.[20]
On each Frank DeCato as President signed under the categories entitled "Plumber" and "Plumbing Supplies;" there appears to be no serious question of this. The witnesses Norman Bender and Robert Miller, the two supply houses involved, testified that they were not aware that DeCato had signed these waivers. Nor did either recall authorizing him to do so. DeCato testified that he signed the lien waivers without any discussion with Bender or Middlesex and that he took it on himself to sign them. He maintained that he paid these suppliers as long as Foxboro was paying him and that American stopped working on the project when Foxboro unjustifiably refused to pay it.
Whether the lien waivers operate as a waiver of American's claims pro tanto, if at all, must be determined. American claims that its mechanic's lien is separate from and not affected by the liens of Bender and Middlesex which, in turn, are valid and not affected by American's lien. American further argues that the mechanic's lien waivers "do not automatically vitiate" the rights of Bender and Middlesex to claim the validity of their liens. Here American maintains that neither Bender nor Middlesex were signatories to the agreements of Foxboro and American. In this regard it relies on a statement in Pero Building Co. v. Smith,6 Conn. App. 180, 185, A.2d (1988), which says that a "contractor cannot bargain away the lien rights of subcontractors or materialmen who are not themselves privy to the contractor's agreement." Curiously, it also argues that Norman Bender and Robert Miller testified that Frank DeCato "had no authority to CT Page 2311 execute a lien waiver" on their behalf and furthermore that this issue was never discussed between them. On the other hand, Foxboro asserts that American's claim must be diminished here by $2,560.00, the amount of its claim Foxboro claims American waived by the waivers as to Buildings #21, #23 and #24. This implicates Foxboro's claim that the claims of Bender and Middlesex are each separate and distinctive from American's claim. Foxboro maintains that the derivative[21] rights stem from General Statutes49-33(e)(f) and 49-36 as expounded in Seaman v. Climate Control Corp., 181 Conn. 592, 436 A.2d 271 (1980). Foxboro contends that that agreement applies to the lien waivers. It further contends that not only has our Supreme Court expressed approval that in addition to bona fide payments made by the owner to the contractor, an owner may reduce its exposure to subcontractors of a primary contractor by expending reasonable sums for the cost of completion of a project and here it refers to Rene Dry Wall Co. v. Strawberry Hill Associates, 182 Conn. 568, 571-572, 438 A.2d 774
(1980).
The court agrees with Foxboro's claim that Bender and Middlesex' lien claims are derivative in nature. The distinctive nature of Bender's and Middlesex' claims apply, under the circumstances of these cases, to all their claims against Foxboro throughout. There is no question but that the purpose of the mechanic's lien is to give one who furnishes materials or services "the security of the building and land for its payment of his claim by making such claims a lien thereon. . ." H S Torrington Associates v. Lutz Engineering Co., supra, 553. Despite its remedial purpose and "[A]lthough this understanding of legislative purpose counsels generous construction in favor of the mechanic's lien, it does not permit a court to extend the mechanic's lien beyond that which is authorized by the statutes." Rene Dry Wall Co. v. Strawberry Hill Associates, supra 573. It appears that the two provisions directly relevant on this issue in the statutory scheme are 49-33 and 49-36 which delimit the fund to which a properly noticed mechanic's lien may attach. Both sections start with the proposition that no mechanic's lien may attach to any building or land in an amount greater than the price which the owner has agreed to pay to the general contractor for the building being erected or improved. Under 49-33 as to any subcontractor (here Bender and Middlesex) whose rights are to be subrogated to the rights of the person (American) through whom the subcontractor claims, such subcontractor's rights may be diminished to the extent that that amount ". . . exceeds the reasonable cost. . .of satisfactory completion of the contract plus any damages resulting from . . . default for which . . . [American] might be held liable to the owner. . . ." This amount may be further diminished by ". . . all bona fide payments, as set out in section 49-36, which are made by the owner [to American] before receiving notice of the mechanic's lien or liens." Rene Dry Wall Co. v. Strawberry Hill Associates, supra CT Page 2312 572; See Seaman v. Climate Control Corporation, supra, 596.
It is submitted that the instant mechanic's lien claims of Bender and Middlesex fall within the rationale of Seaman's and Rene Dry Wall as the statutory scheme was interpreted in those cases.[22] They are, as Foxboro claims, derivative from that of American. The lien funds to which Bender and Middlesex may look are delimited and is capable of diminution by those to which American may look under General Statutes 49-33 and 49-36. In passing, we note that there are no allegations of fraud or mistake in the pleadings in these cases. See Townsend v. Barlow,101 Conn. 86, 92, 124 A. 832 (1924); Schwarz Brothers v. D'Erumo,17 Conn. Sup. 50, 52 A (1950). Hence, the plain language of the lien waivers means what it says and operates to do what it was intended to do, i.e. to induce third parties such as Foxboro's lender to advance monies to Foxboro at varying stages of project completion. Given Foxboro's lack of knowledge of Bender or Middlesex these executed waivers of lien also enabled Foxboro to decide to whom to disburse its monies received in payment for services and materials as evidenced by the signatures on these waivers. This derivative rationale where it involves a subcontractor's right to mechanic's lien has been said "to flow from his equitable entitlement to the lien which would otherwise attach in favor of the general contractor." Seaman v. Climate Control Corporation, supra 601. "Subrogation is consistent with, and an integral part of, our statutory provisions limiting the totality of mechanic's liens to the unpaid contract debt owed by the owner to the general contractor." Id. 601-602. This rationale applies here between the parties in the circumstances of these cases. As indicated earlier a subcontractor's subrogation rights under 49-33 (e) and (f) may be diminished in such cases by the reasonable costs of satisfactory completion of the contract plus any damages resulting from the default of the person (through whom the subcontractor claims) might be held liable to the owner as well as by any bona fide payments (as set out in 49-36) made by the owner before the owner received notice of any of the mechanic's liens. This court, therefore, determines that Foxboro, as to its claim concerning the waiver of lien rights signed by American, is entitled to diminish or credit against American's claim the amount of $1,000.00.[23]
Next, American claims that the invoices submitted by the plumber Capobianco for plumbing work deserves "little credibility." These invoices total $20,479.63 for materials and work he performed starting on December 31, 1987 and during January 1988 on Buildings #30 and #32, which were admittedly unfinished when American left the project and they also included certain allegedly corrective plumbing works. American contends that these invoices were submitted in totality without regard or segregation for contract work, extra work or contract work and that Foxboro is entitled to diminish American's claim only "by its amount of CT Page 2313 corrective work and cost to complete above the contract (Foxoro-American) price."[24] Further, American maintains that any work performed by Capobianco outside the scope of American's contract is irrelevant, and that any contract balance price due American must be recognized in analyzing Foxboro's claims.
Foxboro, however, maintains that its cost of completion for Building #32 and its setoff for completing Building #30 as evidenced in Capobianco's invoices for $20,479.63, must be utilized in further diminution of American's lien claims.[25]
On this branch of the case we now examine the setoff pleaded by Foxboro as to "all costs of completion incurred in the completion of Building 30" at Foxboro. Capobianco billed Foxboro $11,016.60 for Building #30. Capobianco testified at length concerning his invoices, including that for $11,016.60 for Building #30. Frank DeCato testified on rebuttal concerning them. The credible evidence on the invoices includes, inter alia, the following. Capobianco had at least fifteen years experience in the plumbing business. Because American left, Foxboro asked him to come to the Foxboro project to complete the plumbing work on Buildings #30 and #32.[26] His work included completing units so that certificates of occupancy could be obtained to permit new owners of various units to move in. His work included corrective work as well as installation. Capobianco's arrangement with Foxboro in January 1988 was not written but rather was a "time and materials" arrangement; this type is different from negotiating a regular contract price. Capobianco testified that you do not know what you are going to run into and so you can't give a contract on this type of work. Capobianco's bill for $20,479.63 has been paid by Foxboro.
As to Building #30, Capobianco's bill for that building was $10,328.00. His invoice for that charge recites the charge was to "complete finish work, labor and material for the above 6 units. This includes all necessary material to activate building from previous plumber's work. All of building #30 had extra miscellaneous labor and materials to be brought up to the proper standards. Total labor and material — $10,328.00."
Capobianco was examined and cross examined on all his invoices.
This court finds that the reasonable costs of completion of the work of American on Building #30 is $10,328.00 as Foxboro claims American left Foxboro unjustifiably without completing its contract with Foxboro as to Buildings #30 and #31. DeCato could not tell what had been done or remained to be done by American as to Building #30. While the word "reasonable" was not expressly used as to the figure of $10,328.00, the court finds that it was CT Page 2314 reasonable. The arrangement under which Capobianco was brought in to correct as well as to complete Building #30 up to specifications and standards to obtain certificates of occupancy for new owners is found to have been an arm's length transaction between Foxboro and Capobianco, an experienced plumber. See Rene Dry Wall Co. v. Strawberry Hill Associates, supra 575. The exigencies facing Foxboro once American left unjustifiably, enters into the calculus of determining reasonableness. See Rene Dry Wall Co. v. Strawhill Associates, supra 576. The credible evidence leads to the conclusion that American did absolutely and unequivocally leave the Foxboro project without justification and without completing its contract with Foxboro. See M. Shapiro 
Son Construction Co. v. Battaglia, 138 Conn. 238, 244, 83 A.2d 204
(1981).
This court does not agree with American's claim in its brief that American's "decision to abandon the project was justified under the totality of the circumstances." Its leaving was not just for a mere disagreement over the amount claimed to be owing to it. As indicated earlier, the history attendant to the billing and payment aspect of the project was not harmonious, the evidence of American's efforts for "renegotiation" over the contested invoice of $18,643.50 to adjust or settle it is not only sparse but also not credible and American's departure from the project was not reasonable. Given the cessation by American with its contractual understandings still unfulfilled, Foxboro, in endeavoring to complete the unperformed portion of American's work, was not required to disregard its own interests or exalt those of American above theirs. See generally Eastern Sportswear Co. v. S. Augstein, 141 Conn. 420, 425, 106 A.2d 476 (1954). The charges made by Capobianco to correct as well as to complete the work as to Building #30 unfinished by American and allowed by this court herein were reasonable under the circumstances of their rendition.
Capobianco also performed work and furnished materials to properly complete Building #32 for which he submitted an invoice totalling $7,773. 63. There is no breakdown on this invoice as to the cost for labor and materials on individual aspects of Capobianco's work on Building #32. Rather, the invoice states: "material $2115.00, Tax 7 1/2% $158.63, labor $5550.00, Total due $7773.63." This invoice which covers six units of Building #32 contains among its statement of work done for such unit the statement: "Unit #253 and Unit #263: Main 4 inch C.I. drain line had to be jackhammered and moved to designated areas for proper drainage." In testifying at trial about this invoice Frank DeCato said that this work on this cast iron drain line was work which under their written contract with Foxboro would be an extra because their contract specifically says "Does not include any underground cast iron." He also testified at that time, in CT Page 2315 disputing Capobianco's charge of $7,773.63, that it would cost "us (American)" $5,770.00 to complete Building #32. American's post-trial brief states that "American testified that it did not finish Bldg. 32 and that the cost to complete is $5,770.00." This court credits DeCato's statement concerning its $5,770.00 figure, given as it was on rebuttal after Capobianco had testified. It is reasonable to assume that DeCato's lower figure of $5,770.00 took into account, based on his twenty years experience as well as his experience on the Foxboro project, did not include any amount that could fairly be attributed to the cast iron work that had to jackhammered and moved according to Capobianco. Here we note that while mathematical exactitudes in the proof of "damages" is often impossible, the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate; damages must be proved with reasonable certainty. Falco v. James Peter Associates, Inc., 165 Conn. 442, 445, A.2d (1973). The evidence must be such as to lay a foundation which will enable the trier to make a fair and reasonable estimate. Hedderman v. Robert Hall of Waterbury, Inc., 145 Conn. 410, 414, 144 A.2d 60 (1988). Moreover, "on finding facts favorable to a party a trial court is not confined to the testimony directly offered by it, but may gather those facts from testimony produced by its opponent." Leitzes v. F. L. Caulkins Auto Co., 123 Conn. 459, 461, 196 A. 145
(1937). There is such evidence here as set out above. Therefore, despite the lack of itemization of labor and materials on the various units in Building #32 which totals $7,773.63, the court concludes that Foxboro is entitled, using DeCato's own "estimate" for this purpose, to a further credit of $5770.00 by way of diminution of American's claim.
By way of summary as to the invoices submitted by Capobianco to complete Buildings #30 and #32, this court has allowed a total of $18,234.00. That amount is the total of $10,849.00 allowed as to his invoice #1474, $1,615.00 allowed as to his invoice #1074, and $5,770.00 allowed as to its unnumbered invoice originally submitted by Capobianco in the sum of $7773.63.
Foxboro, by a summary of "Plumbing Back Charges" dated December 10, 1987, which total $2,746.00, also claims this amount in further diminution of American's claim. This amount includes some twenty separate claimed back charges in nine buildings at Foxboro. Krohn testified that this schedule involved "warranty work" needed to get the units involved up to standard for certificates of occupancy. The evidence on these charges that could serve as credible in further diminution of America's claim is almost entirely unacceptable. This count only allows one item of all these claims. That is for $355.00 on Building #23 Unit #37. With this, thus, the total which the court sustains in "diminution" of America's claim of $18,463.00, is $26,099.36. CT Page 2316
Accordingly, based on the applicable law and the evidence deemed credible, the court finds the issues on the first count of each of the three complaints in favor of Foxboro.
We next take up the second count of each of the three complaints all of which are directed against Foxboro only. The three plaintiffs in their briefs argue that American, Bender and Middlesex are each entitled to recover here under the theories of unjust enrichment and quantum meruit. In its brief Foxboro argues that these counts sound in unjust enrichment and not quantum meruit and, in any event, these plaintiffs are not entitled to recover on these counts. This court concludes that none of the plaintiffs are entitled to a recovery on either theory on the second count.
"Both injust enrichment and quantum meruit are doctrines allowing recovery on the theory of restitution, that is, the restoration to a party of something of which he was deprived because of the injust enrichment of another at his expense. See G. Palmer, Restitution (1978) 1.1." Burns v. Koellmer, 11 Conn. App. 375,383, 527 A.2d 1210 (1987).
"Unjust enrichment applies `wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.' 5 Williston Contracts (Rev. 5d.) 1479," Providence Electric Co. v. Sutton Place, 161 Conn. 242, 246, 287 A.2d 379
(1971). It is a quasi-contractual theory of recovery. Breen v. Phelps, 186 Conn. 86, 104, 439 A.2d 1066 (1982): 12 Williston Contracts #3d Ed. Jaeger) 1469. A right of recovery under this doctrine of unjust enrichment is essentially equitable its basis being that in a given situation, it is contrary to equity and good conscience for one to retain a benefit which has has come to him at the expense of another. . . . "Connecticut National Bank v. Chapman, 153 Conn. 393, 399, 216 A.2d 814 (1966). Our Supreme Court has also said: "It is clear that in order to recover on the basis of unjust enrichment, it is necessary for a plaintiff to demonstrate two aspects of a transaction. First, it must be shown that the the defendant was benefited, that is, he has received something of value. And second, it must be shown that the benefit was unjust; that it was not paid for by the defendant, to the detriment of the plaintiff." Providence Electric Co. v. Sutton Place, Inc., supra, 246. "With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine [of unjust enrichment] is claimed to examine the circumstances and conduct of the parties and apply this standard." Cecio Bros. Inc. v. Greenwich, supra 564-565. "Equity always looks to the substance of a transaction and not to mere form . . . and seeks `to prevent CT Page 2317 injustice.'" Natural Harmony Inc. v. Normand, 211 Conn. 145, 149,558 A.2d 231 (1989).
Quantum meruit is the remedy available to a party when the trier of fact determines that an implied contract for services existed between the parties, and that, therefore, the plaintiff is entitled to the reasonable value of services rendered. . . ." Burns v. Koellmer, supra 383. The term literally means "as much as he deserved." See Durr v. Moody, 5 Conn. Cir. 718, 26, A.2d 290 (1969). Such contracts are determined from evidence of the parties' course of conduct which implies a promise to pay for a benefit rendered which it would be unfair for him to retain without paying for it. Nardi Co., Inc. v. Allabastro, 314 N.E.2d 367,370 (Ill.App. 1974).
From what has been said earlier in this opinion, nothing more need be added here to justify concluding that American has not demonstrated the right to recover against Foxboro under the second count, either under a theory of unjust enrichment or quantum meruit. Therefore, the second count of American's count is dismissed.[27]
Turning now to the second count of Bender and Middlesex, from what has been said earlier in this opinion, neither of these plaintiffs have demonstrated the right to recover on the second count. The derivative nature through American of the claims of Bender and Middlesex also applies here. Accordingly, Foxboro's motion to dismiss the second count of Bender and Middlesex is granted.
Because, under the circumstances of these cases, the ability of both Bender and Middlesex to recover against Foxboro are derivative through American, neither Bender or Middlesex can recover because American is not owed anything by Foxboro. As set out above American's claim of $18,643.50 against Foxboro has been "diminished" by the court's conclusions that appropriate deductions as to such matters as disallowance for improper billing, waived claims, credits, back charges, reasonable costs of completion of contracts and the like by $26,099.36 — an amount much in excess of $18,643.50 which would remain much in excess even giving American those credits for the few items the court could find proven on their claim of $18,463.50 on the credible evidence.
Despite the circumstance that the court has held that neither bender or Middlesex can recover against Foxboro, the court believes certain additional facts should be set out at this point.
Neither Bender or Middlesex has proved that all the materials each allegedly supplied to American were in fact installed in the Foxboro project. There is evidence that some portion of Bender's CT Page 2318 materials was delivered to the Foxboro site as well as some evidence that some portion of Middlesex' materials were also so delivered. There is, however, the notation "pick up" on a number of Middlesex' invoices. Neither Bender nor Middlesex have raised any serious question that any of the payments made by Foxboro to American over the time American was at Foxboro were made in anything but good faith by Foxboro. Neither Bender nor Middlesex have proven that either of them ever wrote to, contacted, billed, or in any way ever actually looked to Foxboro for payment of supplies furnished to American concerning the Foxboro project. Every one of the invoices offered by Bender and Middlesex show that each was billed to American. The court does not credit American's evidence that Mr. Marcantonio, the president of Foxboro, and inferentially Krohn, knew or should have known that either Bender or Middlesex were furnishing plumbing supplies to Foxboro.[28] Foxboro dealt with American alone throughout and did not know that Bender or Middlesex were involved until each filed their mechanic's lien in February 1988, long after American had left the Foxboro project. In passing, we note that in making these claims American overlooks the representation it made to Foxboro as to the identity of the plumbing supplier when it signed as the supplier on three separate waivers of mechanic's liens for Foxboro. The court must also note that not only was any "benefit" conferred unjust but there was no appreciation or retention of any such benefit by Foxboro under circumstances such as would make it inequitable for Foxboro to retain it without payment of its value. See i.e., Cecio Bros. Inc. v. Greenwich, supra 246; 12 Williston Contracts (3d Ed. Jaeger) 1479, p. 276.
Finally, we turn to the third count in each of the three complaints which, on behalf of American, Bender and Middlesex, are directed against the defendant surety Aetna. From what has been said about it, it is concluded that judgment may be and is entered for Aetna on the third count of each of the three complaints.
Accordingly, judgment is entered for the defendants in each of the three cases, i.e., Dockets #CV-89-0281572S, CV-89-0280230S and CV-0281573S.
Arthur H. Healey State Trial Referee